111 P.3d 100

**Stephen FREIBURGER, Plaintiff–Respondent,**

v.

**J–U–B ENGINEERS, INC., Defendant–Appellant.**

No. 30104.

Supreme Court of Idaho, Boise, January 2005 Term.

March 24, 2005.

Rehearing Denied April 22, 2005.

Arkoosh Law Offices, Chtd., Gooding, for appellant. Charles Thomas Arkoosh argued.

Manweiler, Manweiler, Breen & Ball, and Jerry Michael Ward, Boise, for respondent. M. Sean Breen argued.

TROUT, Justice.

Stephen Freiburger brought this declaratory judgment action against J–U–B Engineers, Inc. (J–U–B), seeking a judicial declaration that J–U–B's non-complete clause in his employment contract was invalid and unenforceable under Idaho law. The district court granted summary judgment to Freiburger, from which J–U–B now appeals. Because we agree with the trial court that the clause is unreasonable and greater than necessary to protect J–U–B's legitimate business interests, we affirm.

## I.

## FACTUAL AND PROCEDURAL BACKGROUND

In December 1991, J–U–B hired Stephen Freiburger and, as part of his employment application, he signed an Applicant's Certification and Agreement (Agreement). The Agreement included a restrictive covenant (Covenant), which is at the center of this controversy. That Covenant reads, in part:

> Should I become an employee of JUB, it is anticipated that my responsibilities may increase with time and that I may be an official representative to many clients served by JUB. Therefore, *I agree that for a period of two years following any date of termination of my employment with JUB, I would not attempt to take, take or join with anyone to take, (without the written consent of JUB) any of past or present clients or projects or any pending clients or projects, for which JUB has or would be providing professional services.* (emphasis added).

J–U–B Engineering is one of the largest privately owned engineering firms in the State of Idaho with offices in Boise, Twin Falls, Pocatello, Coeur d'Alene and Nampa, and employs approximately 250 people. It does business throughout the Northwest and has been in business for more than 30 years.

Freiburger became a professional engineer in 1991, just as he joined J–U–B. When he was hired, he had prior experience in consulting engineering and technical expertise in both transportation and solid waste engineering. Freiburger served as J–U–B's project manager in Twin Falls, moving to the Boise office and then to Nampa. While with J–U–B, Freiburger participated in all aspects of client development and knew how J–U–B engaged in client development and client service. He attended manager meetings and was privy to proprietary information concerning existing clients and projects.

According to J–U–B, Freiburger participated in its "inner circle" and in planning efforts to "capture more of the transportation engineering work" available in J–U–B's area of practice. Also, it appears that because of his prominence in the transportation group, he built a relationship base with the Idaho Department of Transportation (IDOT), becoming one of J–U–B's primary liaisons with IDOT, and embodying J–U–B's goodwill effort with IDOT to secure IDOT projects and contracts.

On April 25, 2001, Freiburger resigned from J–U–B. About six months later, Freiburger joined Riedesel Engineering, LLC (Riedesel). Soon after Freiburger began his new employment, Riedesel wanted to propose on an IDOT project and tout Freiburger's qualifications in order to secure IDOT projects. At that time, Freiburger wanted to make sure he was not in conflict with the Covenant and, therefore, made several attempts, both directly and through his attorney, to obtain from J–U–B a list of clients that J–U–B considered to be covered under the terms of the Covenant. When J–U–B refused to provide any list of those clients, and simply instructed Freiburger that he should run any potential clients by them first, Freiburger initiated this declaratory judgment action on September 12, 2002, asking the court to declare the Covenant overbroad, unreasonable, void and unenforceable as a matter of law.

J–U–B first sought to disqualify Freiburger's attorney, M. Sean Breen, alleging that Breen had obtained confidential information from J–U–B five years earlier when he had done some regulatory consulting work for a J–U–B project at Freiburger's request. After a hearing on the merits, the trial court found there was no conflict of interest because there was no confidential information belonging to J–U–B ever obtained or used by Breen and, therefore, denied J–U–B's motion to disqualify him.

Freiburger then filed a motion for summary judgment, seeking to have the Covenant declared unenforceable as a matter of law. After oral argument on the matter, the trial court issued its memorandum decision, granting summary judgment to Freiburger. The court found the Covenant unreasonable and fatally overbroad and declined to strike the offending language in the Covenant to make it reasonable, finding that the court would essentially have to rewrite the entire Covenant to make it reasonable. Freiburger then requested costs and attorney fees pursuant to I.C. § 12–120(3). The court granted Freiburger's request, awarding him $117.00 in costs and $9,360.00 in fees. J–U–B timely filed this appeal.

## II.

## STANDARD OF REVIEW

When this Court reviews the district court's ruling on a motion for summary judgment, it employs the same standard as the district court's original ruling on the motion. *Farmers Ins. Co. v. Talbot,* 133 Idaho 428, 431, 987 P.2d 1043, 1046 (1999) (citing *Smith v. Meridian Joint Sch. Dist. No. 2,* 128 Idaho 714, 718, 918 P.2d 583, 587 (1996)). Pursuant to I.R.C.P. 56(c), summary judgment must be entered when "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." When assessing a motion for summary judgment, all facts are to be liberally construed in favor of the nonmoving party and the Court draws any reasonable inferences and conclusions in that party's favor. *G M Farms v. Funk Irrigation Co.,* 119 Idaho 514, 517, 808 P.2d 851, 854 (1991).

## III.

## ANALYSIS

### A. The Covenant Not to Compete

J–U–B's primary contention on appeal is that the district court erred in granting Freiburger summary judgment because it has a legitimate interest in protecting its business from former employees who may endeavor to take J–U–B clients and the Covenant contained in the Agreement reasonably protects that interest. Restrictive covenants not to compete in an employment contract, though enforceable, are disfavored and will be strictly construed against the employer. *See Stipp v. Wallace Plating, Inc.,* 96 Idaho 5, 6, 523 P.2d 822, 823 (1974); *Shakey's Inc. v. Martin,* 91 Idaho 758, 762, 430 P.2d 504, 508 (1967). In order to be enforceable, a covenant not to compete must be ancillary to a lawful contract supported by adequate consideration, and consistent with public policy. *McCandless v. Carpenter,* 123 Idaho 386, 390, 848 P.2d 444, 447 (Ct.App.1993).

In addition, a covenant not to compete contained in an employment contract must be reasonable as applied to the employer, the employee, and the public. *See Stipp,* 96 Idaho at 6, 523 P.2d at 823; *Insurance Ctr., Inc. v. Taylor,* 94 Idaho 896, 899, 499 P.2d 1252, 1255 (1972); *Marshall,* 81 Idaho at 203, 339 P.2d at 508; *McCandless,* 123 Idaho at 390, 848 P.2d at 447. In other words, a covenant not to compete is reasonable only if the covenant: (1) is not greater than is necessary to protect the employer in some legitimate business interest; (2) is not unduly harsh and oppressive to the employee; and (3) is not injurious to the public. *See* RESTATEMENT (SECOND) OF CONTRACTS § 188 (1981).

We note that some jurisdictions have applied different standards of reasonableness, depending on the type of restrictive covenant involved and what it is seeking to accomplish. For instance, some courts have held that covenants not to compete ought to be analyzed differently than anti-piracy covenants. *See, e.g., Merrill Lynch, Pierce, Fenner Smith Inc. v. Ran,* 67 F.Supp.2d 764 (E.D.Mich.1999). Under this view, covenants not to compete preclude employees from working in the same business as the employers' for certain periods of time and thus, are strictly construed against employers. *See Hilb, Rogal and Hamilton Co. of Arizona, Inc. v. McKinney,* 190 Ariz. 213, 946 P.2d 464, 467 (Ct.App.1997). On the other hand, anti-piracy agreements restrict the terminated employee from soliciting customers of his former employer or making use of confidential information from his previous employment. *Id.* These agreements have been held to a less stringent test of reasonableness than blanket prohibitions of competition, as they are not considered nearly as oppressive and unreasonable as non-compete agreements. *See Corroon Black of Ill., Inc. v. Magner,* 145 Ill.App.3d 151, 98 Ill.Dec. 663, 494 N.E.2d 785 (1986); *Olliver/Pilcher Ins., Inc. v. Daniels,* 148 Ariz. 530, 715 P.2d 1218 (1986).

However, we think the more reasoned approach is to simply determine whether or not the clause is no more restrictive than necessary to protect the employer's legitimate business interests. This test can aptly be applied regardless of whether the clause itself seeks to limit the employee's work in the field entirely, or seeks only to limit the employee in approaching former clients. Indeed, we have in the past upheld the application of a restrictive covenant, no matter what it is termed, only after a determination that it was no broader than necessary to protect an employer's legitimate business interest. *See Magic Lantern Prod., Inc. v. Dolsot,* 126 Idaho 805, 892 P.2d 480 (1995); *Insurance Center, Inc. v. Taylor,* 94 Idaho 896, 499 P.2d 1252 (1972).

### 1. *J–U–B's Legitimate Business Interest*

The first issue the Court must consider is whether J–U–B has a legitimate business interest worthy of protection. The burden is on the employer to prove the extent of its protectable interest. *McCandless,* 123 Idaho at 391, 848 P.2d at 449. The general rule is that an employer is not entitled to protection against ordinary competition. *See Pinnacle Performance, Inc. v. Hessing,* 135 Idaho 364, 367, 17 P.3d 308, 311 (Ct.App.2001) (citing 54A AM.JUR.2D MONOPOLIES § 916 (1996)). However, employers are entitled to protect their businesses from the detrimental impact of competition by employees who, but for their employment, would not have had the ability to gain a special influence over clients or customers. *See Amex Distrib. Co., Inc. v. Mascari,* 150 Ariz. 510, 724 P.2d 596, 605 (Ct.App.1986); *American Software USA, Inc. v. Moore,* 264 Ga. 480, 448 S.E.2d 206, 208 (1994); *Holloway v. Faw, Casson Co.,* 319 Md. 324, 572 A.2d 510, 515 (1990); *Prof'l Bus. Services Co. v. Rosno,* 256 Neb. 217, 589 N.W.2d 826, 831 (1999). Thus, "the employer has a protectable interest in the customer relationships its former employee established and/or nurtured while employed by the employer, and is entitled to protect itself from the risk that a former employee might appropriate customers by taking unfair advantage of the contacts developed while working for the employer." *W.R. Grace Co. v. Mouyal,* 262 Ga. 464, 422 S.E.2d 529, 531 (1992); *See also* 54A · AM. JUR.2d MONOPOLIES § 919 (1996).

Freiburger entered into an employment relationship with J–U–B that clearly both placed him in direct contact with J–U–B clients, as well as placed him in the forefront in developing J–U–B's goodwill effort with several clients. Therefore, we conclude that J–U–B has a legitimate business interest worthy of protection in the client relationships Freiburger helped to develop while in J–U–B's employ.

## 2. *The Covenant as a Reasonable Means of Protecting the Interest*

The second step in analyzing the Covenant is to determine whether it is a reasonable means of protecting J–U–B's legitimate business interest. The core provision in the Covenant provides:

> ... I agree that for a period of two years following any date of termination of my employment with J–U–B, I would not attempt to take, take or join with anyone to take, (without the written consent of J–U–B) any of past or present clients or projects or any pending clients or projects, for which J–U–B has or would be providing professional services....

The district court found that the Covenant was an overbroad means of protecting J–U–B's interest in the goodwill developed by Freiburger because the Covenant unreasonably prohibited Freiburger from providing any services to J–U–B's clients, current, past and potential, without regard to whether Freiburger had any contact with these clients. This conclusion is similar to an Idaho Court of Appeals decision that analyzed a restrictive covenant similar to the one at issue here. *See Pinnacle Performance, Inc. v. Hessing*, 135 Idaho 364, 17 P.3d 308 (Ct. App.2001).

In *Pinnacle*, the employer entered into a written employment agreement with Hessing, as an independent contractor, to develop a prototype card shuffler for the employer's client, Casinovations. The agreement contained a non-competition clause that read: "Contractor agrees to not offer, sell, or trade his services directly to Company clients, both current and past, for a period of two (2) years from completion of Contractor's work for the Company ...." *Pinnacle*, 135 Idaho at 366, 17 P.3d at 310. After developing the prototype, Hessing signed an employment agreement with Casinovations, and the employer filed a complaint against Hessing alleging that he had breached the covenant not to compete.

The Court of Appeals noted that if a court finds that an employer has a legitimate business interest, such a business interest is reasonably protected by prohibiting the employee from providing services to those clients with whom the employee developed customer goodwill. *Id.* at 368, 17 P.3d at 312. "However, a prohibition against doing business with an employer's clients, without regard to whether a relationship existed between the client and the employee, is an overbroad means of protecting the employer's interest in the goodwill developed by the employee." *Id.* (citing *American Software*, 448 S.E.2d at 209). Thus, the court found that since the covenant not to compete failed to reasonably limit the scope of the prohibited activity to those clients with whom Hessing had contact, the prohibitive impact of the covenant was greater than necessary to protect the employer's legitimate business interest.

The decision also noted that a covenant not to compete which prohibits an employee from working in any capacity or which fails to specify with particularity the activities the employee is prohibited from performing is too overbroad and indefinite to be considered reasonable. *Id.* at 368–69, 448 S.E.2d 206, 17 P.3d at 312–13; *See also National Teen–Ager Co. v. Scarborough*, 254 Ga. 467, 330 S.E.2d 711, 713 (Georgia 1985); *American Family Life Assurance Co. v. Tazelaar*, 135 Ill.App.3d 1069, 90 Ill.Dec. 789, 482 N.E.2d 1072, 1075 (1985). The court found that the term "services" was not expressly defined in the covenant and, therefore, it failed to limit the scope of activities Hessing was prohibited from performing. The covenant was too overbroad and indefinite to be considered reasonable.

██ The Covenant at issue here is clearly an overbroad means of protecting J–U–B's legitimate business interest. First, J–U–B has actively operated throughout the Northwest region for nearly thirty years and clear-

ly has a large client base both past and present, yet the Covenant prohibits Freiburger from taking any of this large group of clients regardless of whether Freiburger helped to develop J–U–B's goodwill effort toward that client. Instead of the reference point of the Covenant being goodwill created through the efforts of Freiburger, the Covenant prohibits contact with any past, present or potential client of J–U–B at the time Freiburger left J–U–B's employ. It is possible, under the plain language of the Covenant, that if J–U–B had a client or project twenty years ago and had not had contact with that client since, Freiburger would still be prohibited from taking that client for a period of two years after he left J–U–B. Since the Covenant includes past clients or projects, without any meaningful limitation, it is an overbroad means of protecting the employer's interest in the goodwill Freiburger helped to develop.

Secondly, just as in *Pinnacle*, the Covenant at issue unreasonably prohibits Freiburger from providing any services to J–U–B's clients, current, past, or pending. We note that nothing in the Covenant limits the scope of activities Freiburger is prohibited from offering. The prohibitive impact of this limitation is especially harsh and oppressive to Freiburger considering the nature of the clients involved in this area of business. The Covenant would likely prevent Freiburger from performing any services to a number of state and local governmental agencies throughout the Northwest.

Third, the portion of the Covenant that refers to taking any "pending" clients or projects for whom J–U–B "would be providing professional services" is also unreasonable and overbroad. J–U–B contends that "pending" can reasonably be defined as "imminent," and should be interpreted to mean identified clients in whom J–U–B has invested goodwill and to whom J–U–B has sufficiently recruited and engaged such that the client will hire J–U–B. However, this ignores the fact that the term is not defined in the Agreement and can reasonably be given more than one possible interpretation, making it an overbroad description of the clients Freiburger is prohibited from "taking."

There is no "goodwill" limitation to be found, nor is there language that limits the interpretation of "pending" clients or projects. Instead, the clause appears to require Freiburger to know to which "pending" clients or projects J–U–B "would be" providing professional services in the future. Therefore, it is clear that the Covenant is overbroad and an unreasonable means of protecting J–U–B's legitimate business interest.

### 3. *Judicial Modification of the Covenant*

■ J–U–B finally argues that even if the Covenant is determined to be too overbroad to be enforced, Idaho case law suggests that a non-compete covenant can be altered by the court to render it reasonable and enforceable. In fact, J–U–B argues this Court should do so unless it determines the Covenant was not drafted in good faith. *See Data Management, Inc. v. Greene.*, 757 P.2d 62 (Alaska 1988). This Court has approved of the modification of otherwise unreasonable covenants not to compete. *See Insurance Ctr., Inc., v. Taylor,* 94 Idaho 896, 899, 499 P.2d 1252, 1255 (1972). In doing so the Court explained:

> It is the conclusion of this Court that the cases which authorize a modification of restrictive covenants ancillary to employment agreements are more consistent with the inherent concerns of a court of equity-fairness and reasonableness. Adoption of the modification principle allows a court to escape the rule of arbitrary refusal to enforce a covenant which, while unreasonable or indefinite in some of its terms, nevertheless serves to protect a legitimate interest of the parties or the public as the case may be.... [T]his Court seeks to provide flexibility to determining remedies available to the parties and the public. Consequently, enforcement is variable upon the circumstances of each case. Rather than choosing between absolute enforcement or unenforcement, there will be a wide range of alternatives available to meet the particular facts of the case being tried.

*Id.* at 900–901, 499 P.2d at 1255–56. Nevertheless, "a covenant not to compete may not be modified to make it reasonable if the

covenant is 'so lacking in the essential terms which would protect the employee' such that the trial court is no longer modifying but rewriting the covenant." *Pinnacle Performance,* 135 Idaho at 369, 17 P.3d at 313 (*quoting Insurance Ctr.,* 94 Idaho at 900, 499 P.2d at 1256).

■ Here, it would be necessary not only to strike *some of the words of the Covenant,* but in addition, to add clauses relating to good will and relationships between Freiburger and the clients and defining the parameters of what services Freiburger would be prohibited from providing to J–U–B clients. This is far more than a "blue pencil" approach to an unreasonable word or two and would have the district court or this Court re-writing the parties' contract. The district court correctly concluded that merely striking a few words from the Covenant could not achieve the goals of making it reasonable and enforceable and we agree that the only alternative was to declare the entire clause void and unenforceable as a matter of law.

**B. The Motion to Disqualify Freiburger's Counsel**

■ J–U–B contends that Freiburger's counsel, M. Sean Breen, possessed confidential information concerning J–U–B, which Breen obtained through a prior attorney-client relationship with J–U–B when Breen provided regulatory assistance on a landfill project in which J–U–B was involved. Specifically, J–U–B maintains that Breen possessed information regarding J–U–B's strategy and approach to litigation and used that knowledge to counsel and advise Freiburger how to litigate with J–U–B. The company therefore argues that under Rule 1.9(c) of the Idaho Rules of Professional Conduct, Breen is prohibited from using information obtained from a former client to the disadvantage of the client and should have been disqualified from representing Freiburger further in this case.

The district court determined there was no violation of Rule 1.9(c) because it found there was no confidential information obtained through Breen's representation of J–U–B that affected this litigation or his ability to represent Freiburger. We agree with the district court's analysis. As articulated by J–U–B, the alleged "confidential information" is simply J–U–B's proclivities in being vigilant and aggressive in defending their legal rights. Supposedly, this information could be used to determine that J–U–B would be aggressive in defending its rights under the Covenant at issue. However, as the district court determined, it is unlikely this can even be classified as confidential information. Moreover, the possession of such information in no way gives any kind of advantage to Freiburger in this case. The record supports the conclusion that Breen had no knowledge of or discussions with J–U–B concerning its non-compete agreements, employment policies, or Freiburger's employment relationship. The district court's ruling on this matter will not be disturbed on appeal.

**C. The District Court's Award of Attorney's Fees**

■ After entering judgment in Freiburger's favor, the district court awarded him $9,360.00 in attorney fees pursuant to I.C. § 12–120(3). J–U–B contends this award was erroneous because this was a declaratory judgment action and the apportionment of expenses in such an action is governed solely by I.C. § 10–1210. J–U–B also relies on the case of *Edwards v. Edwards,* 122 Idaho 971, 842 P.2d 307 (Ct.App.1992), for the proposition that attorneys fees may not be awarded pursuant to I.C. § 12–120(3) in a declaratory judgment action.

■ First, the *Edwards* case has no application here because there was no commercial transaction which constituted the "gravamen" of the suit. Here, the gravamen of both Freiburger's declaratory judgment action and J–U–B's counterclaim was the enforceability of a covenant contained in an employment agreement. The term "commercial transaction" is defined in § 12–120(3) as "all transactions except transactions for personal or household purposes." Thus, "[w]here a party alleges the existence of a contractual relationship of a type embraced by section 12–120(3), ... that claim triggers the application of the statute." *Continental Cas. Co. v. Brady,* 127 Idaho 830, 835, 907 P.2d 807, 812 (1995). There

must, however, be a nexus between the commercial transaction and the lawsuit. *Id.* There is no question that a "commercial transaction" as defined in I.C. § 12–120(3) is involved here. Both parties entered into an employment agreement which contained a restrictive covenant. Freiburger brought this action seeking a judicial declaration regarding his potential contractual obligations under the Covenant. This obligation is clearly grounded in a "commercial" contract.

■ Furthermore, the mere fact an action is brought as a declaratory judgment action does not preclude the application of I.C. § 12–120(3) to a case where the gravamen is a commercial transaction. *See Continental Cas. Co.,* 127 Idaho at 835–36, 907 P.2d at 812–13 (fees awarded in a declaratory action regarding duties under insurance contract); *Farmers Nat'l Bank v. Shirey,* 126 Idaho 63, 73, 878 P.2d 762, 772 (1994) (fees awarded in a declaratory action regarding status of security interest).

■ Finally, although J–U–B tries to argue that I.C. § 10–1210 is the controlling statute in regard to attorneys fees in declaratory judgment actions, the statute, by its plain terms, clearly only applies to "costs" in declaratory actions. The general rule is that costs do not include attorney fees unless attorney fees are expressly included in the definition of the term costs. *Noble v. Ada County Elections Bd.,* 135 Idaho 495, 504, 20 P.3d 679, 688 (2000); *See* 20 AM.JUR.2D *Costs* § 1 (1995). The legislature's awareness of this rule is demonstrated by its authorization of awards of costs and attorney fees. *See, e.g.,* I.C. §§ 5–321, 6–101(3)(*o*), 7–610, 9–342, 12–120(5), 16–1620A (all referring to costs and attorney fees). When the legislature has intended that the term costs cover attorney fees, it has so provided. *See, e.g.,* I.C. §§ 18–3302(6), 18–6713(9), 18–7805(a), 25–3405(7), 26–3106(1)(c), 30–3–48(3), 30–3–54(4), 37–1014, 59–1320(4), 67–6626. Therefore, we find that I.C. § 10–1210 does not provide the exclusive method for apportionment of costs and attorney fees in a declaratory action.

### D. Attorney Fees on Appeal

■ Freiburger requests attorney fees on appeal pursuant to I.C. § 12–120(3). Where a party has prevailed both at the trial court level and on appeal, and received an award of attorney fees under I.C. § 12–120(3) at the trial level and that award is affirmed on appeal, that party is also entitled to an award of attorneys fees for the appeal pursuant to I.C. § 12–120(3). *See Eagle Water Co., Inc. v. Roundy Pole Fence Co., Inc.,* 134 Idaho 626, 7 P.3d 1103 (2000). Because Freiburger has prevailed as to all of the issues raised on appeal, we award him attorney fees on appeal.

### IV.

### CONCLUSION

The Covenant at issue is unenforceable as a matter of law because it is unreasonable and much broader than necessary to protect J–U–B's legitimate business interest in the client goodwill developed by Freiburger while in J–U–B's employ. The Court cannot simply strike a few words from the Covenant to make it reasonable and enforceable and would be forced to rewrite the contract, adding essential limiting language in order to bring the Covenant into compliance with applicable law. The district court did not err in awarding Freiburger attorneys fees pursuant to I.C. § 12–120(3). Therefore, the decision of the trial court is affirmed in all respects and Freiburger is awarded his attorneys fees incurred in defending this appeal together with costs.

. Chief Justice SCHROEDER and Justices EISMANN, BURDICK and JONES concur.